**UNITED STATES of America**

v.

**Michael Roland ROY.**

**Crim. A. No. N–83–15.**

United States District Court,
D. Connecticut,

Nov. 19, 1984.

Alan H. Nevas, U.S. Atty., Jeremiah F. Donovan, Asst. U.S. Atty., New Haven, Conn., for plaintiff.

Thomas G. Dennis, Federal Public Defender, Richard Reeve, Asst. Federal Public Defender, New Haven, Conn., for defendant.

## RULING ON DEFENDANT'S MOTION TO DISMISS

ZAMPANO, District Judge.

The defendant, Michael Roland Roy, moves to dismiss federal firearms charges pending against him on the ground that federal prosecutors violated certain provisions of the Interstate Agreement on Detainers Act ("IAD"), 18 U.S.C., App. (1982). Specifically, he contends (1) that the government failed to bring him to trial within 120 days after he was transferred from state to federal custody, as is required by Article IV(c); and (2) that he was not tried on the federal indictment before being returned to state custody, in violation of Article IV(e).

## I. FACTS

Because many of the dates and times involved are crucial to a resolution of the issues presented, the facts must be set out in detail.

On December 3, 1982, Roy was arrested by detectives of the Rocky Hill Police Department on state charges of criminal attempt to commit robbery. He was incarcerated as a pretrial state prisoner at the Hartford Community Correctional Center ("Hartford CCC"), and bond was set at $50,000. On December 8, 1982, a federal detainer for the charge of escape, pending before the United States District Court for the Northern District of Illinois, was received at Hartford CCC. On December 16, 1982, Roy was transferred to the Connecticut Correctional Institution at Somers ("Somers CCI"). On January 27, 1983, Roy's State of Connecticut parole for a previous sentence was revoked, so that he became a state prisoner serving a state sentence on that date. On January 28 and 29, respectively, detainers were filed at the Somers CCI by California state authorities

charging Roy with murder, and by Massachusetts authorities charging him with robbery.

The indictment in the instant case for willfully possessing firearms, in violation of 26 U.S.C. §§ 5861, 5871 and 18 U.S.C., App. § 1202, was returned by a grand jury on February 24, 1983. Magistrate Latimer issued a bench warrant for Roy's arrest, and at that time the government stated the warrant was to act as a detainer. Also on February 24, the United States Marshal's Service for the District of Connecticut sent a separate detainer,[1] based on the federal firearms charges in this case, to Hartford CCC, although Roy had been transferred over two months previously to Somers CCI.[2] Authorities at Hartford CCC forwarded the detainer to Somers CCI, and it was recorded as arriving at Somers on March 3, 1983, the day after the bench warrant was served on Roy.

In the meantime, the government filed for and received a writ of habeas corpus *ad prosequendum* in this case on February 28, 1983. Pursuant to an order to produce based on the writ, Roy was transported by the deputy marshals from Somers CCI to federal district court in Bridgeport on March 2, 1983. After Roy entered a plea of not guilty, Chief Judge Daly set bond at $150,000, and Roy was returned to Somers CCI. Various motions relating to discovery were ruled on by Judge Daly during March 1983.

In addition, Judge Daly scheduled a hearing on Roy's motion to suppress for April 4, 1983 at 2:00 P.M. On that morning at 10:00 A.M., pursuant to a second order to produce based on the writ of habeas corpus *ad prosequendum* issued on February 28, Roy was taken into federal custody by deputy marshals at the Somers CCI and taken to Hartford where a second team of deputy marshals transported him to the federal

---

**1.** The detainer sent was the standard U.S. Marshals Service Form 16, which is prominently labeled in ⅜–inch type "DETAINER."

**2.** The individual in the Marshals Service who completed the detainer form apparently was unaware that Roy's state parole had been re-

voked, and that Roy was no longer at Hartford CCC where state pretrial detainees are housed. A box on the detainer form that should be marked when a detainer is filed against a prisoner who is serving a sentence in fact was not marked.

court in Bridgeport, arriving at 1:00 P.M. that day. The hearing before Judge Daly, at which several witnesses testified, concluded shortly after 5:00 P.M. Rather than returning Roy to the Somers CCI, the marshals, for reasons to be discussed hereinafter, decided to house Roy overnight at the Bridgeport Community Correctional Center ("Bridgeport CCC"), a local state jail facility a few miles from the federal courthouse. The following day, April 5, Roy was returned by the marshals to Somers CCI, where he arrived at 12:30 P.M.

Subsequently, before ruling on Roy's motion to suppress, Judge Daly transferred the case to this Court. The motion to suppress was reheard by this Court on May 23, 1983.

While that motion was pending, Roy was removed from Somers CCI on June 14 and transported to California, pursuant to the detainer filed by that state in January. On July 22, 1983, the charges against him in California were dismissed and Roy was returned to Somers CCI on August 2.

This Court granted Roy's motion to suppress on August 9, 1983. *United States v. Roy*, 568 F.Supp. 1127 (D.Conn.1983). Shortly thereafter, the pending Connecticut state charges against Roy were nolled on August 20, but Roy was still held at Somers CCI pursuant to the state sentence he was serving after his parole was revoked. This action on federal firearms charges was continued for 17 days at the request of the government following a hearing in court on September 2, 1983, to allow it to decide whether to appeal, under 18 U.S.C. § 3731, the Court's ruling on the motion to suppress. The government filed its notice of appeal on September 16, 1983.

On September 12, 1983, the Marshals Service filed a detainer against Roy relating to a bank robbery indictment pending in the United States District Court for the Middle District of Florida. That court issued a writ of habeas corpus *ad prosequendum*, which was filed at Somers CCI on October 17. On October 24, Roy was transported by federal officials from Somers CCI to the Federal Correctional Institu-

tion at Danbury, Connecticut, and then to Florida by federal marshals acting pursuant to the writ. While he was in Florida, Roy's Connecticut sentence, reinstated after his parole violation, expired on February 16, 1984, and Roy became a federal pretrial prisoner on that date.

Roy was tried on the bank robbery charges in federal court in Florida, and, on May 27, 1984 a verdict of not guilty was returned. The next day, Roy began the return trip to Somers CCI, where he arrived on June 8. He is currently in Somers CCI.

Meanwhile, in this action, the Court of Appeals reversed the ruling on the motion to suppress on May 3, 1984, and the case was remanded for trial. *United States v. Roy*, 734 F.2d 108 (2 Cir.1984). 1984). On May 17, 1984, this Court granted the government's motion, pursuant to the Speedy Trial Act, 18 U.S.C. § 3161 (1982), to exclude the time from the date of the Second Circuit's decision to the date Roy returned to Connecticut from Florida.

The motion to dismiss presently pending before the Court was filed on June 15, and, following two unopposed continuances granted at Roy's written request, the Court held an evidentiary hearing on September 26, 1984.

## II. APPLICABILITY OF IAD

Prior to the passage of the IAD, detainers in many cases had adverse effects upon sentenced prisoners. Due to administrative policies, the mere existence of a detainer on a prisoner's record often precluded eligibility for beneficial rehabilitation programs. A detainer permitted prosecutors to shuttle a prisoner between jurisdictions, disrupting his training and work programs, and had the potential effect of hampering his requests for parole. Moreover, studies indicated that a prisoner may suffer psychological strains from the presence of a longstanding detainer which he believes was filed in bad faith or which he knew involved charges that would not be resolved expeditiously. *See United States v.*

*Mauro,* 436 U.S. 340, 359–60, 98 S.Ct. 1834, 1846–47, 56 L.Ed.2d 329 (1978); *Pitts v. North Carolina,* 395 F.2d 182, 187 (4 Cir. 1968); *Walker v. King,* 448 F.Supp. 580, 583–85 (S.D.N.Y.1978); L. Abramson, *Criminal Detainers* 29–34 (1979).

■ In 1970, Congress enacted the IAD "to encourage the expeditious and orderly disposition of ... charges [outstanding against a prisoner] and determination of the proper status of any and all detainees based on untried indictments, informations, or complaints." Article I. Once federal authorities decide to proceed against a state prisoner by way of a detainer, rather than by a writ of habeas corpus *ad prosequendum,* the IAD becomes applicable and the government must comply with its terms. *Mauro,* 436 U.S. at 343, 98 S.Ct. at 1838.

Among other things, the IAD prescribes that, in the absence of a continuance granted in open court for good cause, a prisoner must be tried within 120 days of his arrival in the receiving jurisdiction, Article IV(c), and that, if a prisoner against whom a detainer is pending is sent to another jurisdiction, then he may not be returned to the original or "sending" jurisdiction until the outstanding charges in the receiving jurisdiction are resolved, Article IV(e). If either of these limits is violated, the charges against the prisoner pending in the receiving state must be dismissed. Article V(c).

In the instant case, the government sent the detainer against Roy to state officials on February 24, 1983, and it was received by officials at Somers CCI and recorded on Roy's records on March 3, 1983. The government also obtained a writ of habeas corpus *ad prosequendum* for Roy from the federal court on February 24, 1983.

■ Because a detainer was filed and both the United States and the State of Connecticut have enacted the IAD, 18 U.S.C., app. (1982), Conn.Gen.Stat. § 54–186 (1983), the provisions of the IAD presumably had been triggered. However, the government contends that the IAD is not applicable for several reasons: (1) Roy's "primary status" during most of the relevant time period was as a state pretrial detainee, rather than as a convicted prisoner, as required for application of the IAD; (2) the detainer filed by the government was not a "true detainer," but instead operated only to give state officials notice that a federal case was proceeding against the defendant; and (3) Roy should be estopped from relying on the protections of the IAD since he has acted as if the IAD had not been activated.[3]

■ The government's arguments are not persuasive. As to its contention that Roy's "primary status" was as a state pretrial detainee until state charges were nolled, the government places much weight on the fact that Roy had bond set after his state arrest but he did not post it. Therefore, the government argues, Roy was not "primarily" a sentenced state prisoner as required for the IAD to apply. However,

---

**3.** At oral argument, Roy's counsel stated that a threshold question concerned the applicability of the IAD to intrastate transfers of a prisoner from state to federal custody. No reported lower court decision in this Circuit has been found that has considered the issue, and the Second Circuit did not address it in two recent cases involving intrastate transfers. *United States v. Lawson,* 736 F.2d 835 (2 Cir.1984) (transfers within New York State); *United States v. Chico,* 558 F.2d 1047 (2 Cir.1977) (transfers within Connecticut).

United States Marshal Pasquale Mangini testified at the hearing before this Court that he considered the Connecticut Corrections System to be a unitary entity. If this were so, it might be argued that a prisoner transferred from Somers CCI to Bridgeport CCC for the purpose of an appearance in a federal action would not be entitled to the protection of the IAD. However, the government has not advanced this contention in its brief or at oral argument on Roy's motion.

Under these circumstances, the Court adopts the reasoning of courts in other jurisdictions which have held that the IAD does apply to intrastate transfers between state and federal custody. *See, e.g., United States v. Thompson,* 562 F.2d 232, 234 n. 2 (3 Cir.1977), *cert. denied,* 436 U.S. 949 (1978); *United States v. Schrum,* 504 F.Supp. 23, 25 (D.Kan.1980), *aff'd,* 638 F.2d 214 (10 Cir.1981). As stated in *People v. Cella,* 114 Cal.App.3d 905, 170 Cal.Rptr. 915, 921 n. 6 (1981), the IAD is "more appropriately called the 'Interjurisdictional Agreement on Detainers.'"

after Roy's parole was revoked on January 27, 1983, Roy was serving a state sentence, and it was not possible for him to have posted bond to gain his release from Somers CCI. An individual either is or is not a sentenced state prisoner. Neither the language of the IAD nor any rational reason allows the Court to make the type of distinction the government asks it to make.

▇ The government further argues on this point that because it thought Roy was only a state pretrial detainee when it filed the detainer, the IAD should not apply. The government apparently did not know that Roy's parole had been revoked because the detainer was sent to Hartford CCC, which houses state pretrial detainees, and a box on the detainer form that would indicate Roy was "serving a term of imprisonment" was not checked. The belief of federal authorities as to Roy's status, however, is irrelevant in determining whether Roy was in fact a sentenced state prisoner. The adverse consequences of a detainer depend on a prisoner's actual status as a sentenced state prisoner, not on the government's belief as to his status.

▇ The government's claim that the detainer was not a "true detainer" is similarly without merit. The government contends that because Roy was removed from state custody to be arraigned in this case pursuant to a writ of habeas corpus *ad prosequendum* on March 2, 1983, then, although a detainer was admittedly filed at Somers CCI the next day, it should not be considered a "true detainer." In effect, the government asks the Court to rule that if a state prisoner appears at a federal arraignment pursuant to a writ of habeas corpus *ad prosequendum*, a detainer filed

subsequently does not trigger the IAD. The Court declines the invitation. The IAD protects prisoners who have "detainers" filed against them. When the detainer was filed against Roy on March 3, he was exposed to the adverse consequences of a detainer although he had already been arraigned pursuant to a writ.[4]

▇ Finally, as to the waiver or estoppel issue, the government has failed to establish the necessary elements to sustain the defense as set forth in *United States v. Lawson*, 736 F.2d 835 (2 Cir.1984). For waiver to be found, there must be evidence that the defendant "intended to relinquish his IAD rights or … took any action that was, expressly or impliedly, inconsistent with the provisions of the IAD." *Id.* at 840. The mere fact that Roy submitted his two unopposed motions for continuances by means of written motions rather than by a proceeding in "open court," as specified in Article IV(c), is not so inconsistent with the mandate of the IAD as to constitute a waiver. *See United States v. Odom*, 674 F.2d 228, 231 (4 Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2946, 73 L.Ed.2d 1341 (1982) ("[w]e reject the formalistic notion that the phrase 'in open court' should be interpreted to mean only in the courtroom"). The record is barren of any evidence to support a dismissal of Roy's motion based on waiver or estoppel.

Under these circumstances, the Court concludes that the provisions of the IAD apply to these proceedings.

## III. EFFECT OF THE IAD

Roy asserts that the government's acts and omissions in this case violated the IAD

---

4. Roy claims that the Court should hold that the provisions of the IAD were triggered sometime before March 3, when the Marshals Service mailed the detainer to Hartford CCC. He contends that because the detainer was filed with "prison officials within the Connecticut Department of Corrections" before his federal arraignment on March 2, albeit not with officials at the prison where Roy was incarcerated at the time, the IAD should apply before that date. However, the adverse consequences of a detainer are possible only when the detainer is recorded in the facility in which a prisoner is located. This detainer was placed on Roy's record on March 3 at Somers CCI; it is from that date that the adverse consequences of the detainer accrued.

Roy contends that the IAD became applicable on March 2, 1983, when the bench warrant was served that, according to the government, was to act as a detainer. The Court need not rule on that claim, because the formal detainer was served the next day, and the events of March 2 do not change the Court's analysis as to the effect of the IAD.

in two respects. First, he submits that he was not tried on the pending charges within 120 days of his arrival into federal custody, the "receiving state," in violation of Article IV(c), and second, he argues that he should have been tried on the federal charges before he was returned to state custody in April 1983, as required by Article IV(e).

*120-Day Limit*

Article VI(a) of the IAD governs the computation of the 120-day limit prescribed by Article IV(c). It provides in relevant part that the running of the time limit "shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter."

There is no serious dispute that 44 days elapsed within the meaning of Article IV(c) between March 2 and September 16, 1983.[5] However, the defendant vigorously disputes the government's contention that the eight-month delay, resulting from the government's successful appeal of this Court's ruling on Roy's motion to suppress, should toll the running of time under Article VI(a). If those months are counted, as the defendant urges, the indictment must be dismissed because Roy would have been in federal custody for 300 days without a trial.

No federal decision has been cited by the parties or uncovered by the Court's research which explicitly addresses the narrow issue of whether the time period for the government's interlocutory appeal under 18 U.S.C. § 3731 of an adverse ruling

on a motion to suppress is excludable under Article VI(a). In *United States v. Scheer*, 729 F.2d 164, 168 (2 Cir.1984), the Court of Appeals determined that, "in computing whether or not the requirements of Article IV(c) have been satisfied, it is appropriate to exclude all those periods of delay occasioned by the defendant." Therefore, time spent on motions filed by the defendant, including the government's responses to the motions and the court's rulings on them, are excluded from the 120-day limit. *See People v. Cook*, 63 A.D.2d 841, 842, 406 N.Y.S.2d 643, 644 (1978); *Reaves v. State*, 242 Ga. 542, 250 S.E.2d 376, 386 (1978).[6] *Cf. Foran v. Metz*, 463 F.Supp. 1088, 1097 (S.D.N.Y.), *aff'd without opinion*, 603 F.2d 212 (2 Cir.), *cert. denied*, 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979).

■ In the instant case, the time period between the filing of defendant's motion to suppress and this Court's ruling on the motion is clearly excludable. A motion to suppress made by a defendant is a "pretrial motion," *see United States v. Cobb*, 697 F.2d 38, 42 (2 Cir.1982), and any delay in its resolution must be considered one that has been "occasioned by the defendant" under *Scheer*. The question posed is whether the ending of the period of excludable delay occurred at the time this Court granted the defendant relief on August 8, 1983, or at the time the Second Circuit reversed this Court's ruling on May 3, 1984.

■ In the Court's opinion, it seems reasonable to conclude that the submission of the defendant's motion to suppress for a

---

5. Roy was arraigned on March 2, 1983, and he filed several motions, including a motion to suppress, on March 17 (15 days). The motion to suppress was granted on August 8, thus starting again the counting. On August 17, the government filed a motion for a reconsideration, tolling the running of time (8 additional days). That motion was denied on August 19. On September 2, a continuance was granted at the request of the government after a hearing, so that the intervening 14 days must be counted. The government's notice of appeal was filed on September 16, 1983, before that continuance expired. The Court of Appeals decided the ap-

peal on May 29, 1984, which would have made Roy available to be prosecuted on these charges; however, Roy was in a federal court in Florida being tried on separate charges. On his return to Connecticut on June 8 time again began to run, and the running was tolled by Roy's motion to dismiss on June 15 (7 additional days).

6. The Court is aware that the interpretation of the IAD is a matter of federal law, *Cuyler v. Adams*, 449 U.S. 433, 442, 101 S.Ct. 703, 708, 66 L.Ed.2d 641 (1981), but finds several state cases interpreting it to be analytically useful.

definitive ruling was not complete until after this Court's decision on the matter was reviewed by the Court of Appeals by way of the interlocutory appeal taken by the government. If the government did not seek the review, a trial would have been pointless because all the incriminating evidence against Roy had been suppressed. The appeal was taken in good faith, as all appeals taken under 18 U.S.C. § 3731 must be, there was no deliberate attempt to delay the trial, and the appeal obviously was not frivolous. Under these circumstances, the orderly and plenary resolution of the crucial issues raised in Roy's motion to suppress included not only the proceedings before this Court, but also included the appellate proceedings that tested the validity of the defendant's legal position as adopted by this Court.

It also should be noted that, although prejudice is not a dispositive factor in determining whether an indictment should be dismissed due to a violation of the 120-day provision, no policy of the IAD would be advanced by counting the 256 days of the government's appeal toward the 120-day limit. Most importantly, Roy was not retained at length in federal custody before trial. He was in Somers CCI for all but one night following his federal arraignment, so that the problem that Article IV(c) seeks to prevent—lengthy or indefinite incarceration in the receiving state—is inapplicable in this case. Moreover, during the majority of time involved in the resolution of the government's appeal, from about October 24, 1983 to June 8, 1984, Roy was in Florida either awaiting trial or on trial for federal bank robbery charges. Disruption of any treatment programs at Somers CCI was not due to the government's appeal in this case. Also, because Roy's Connecticut sentence expired on February 16, 1984, he was a pretrial federal prisoner after that date, and as such he would not have been involved in state rehabilitation programs because he was not serving a state sentence. *See United States v. Simmons*, 437 F.Supp. 621, 622–23 (W.D.Pa.

1977), *aff'd without opinion*, 586 F.2d 836 (3 Cir.1978).

Therefore, the period of allowable excludable delay "attributable" to the defendant under Article IV in the instant case began on the date Roy filed his motion to suppress and terminated on the date the Second Circuit issued the final, binding ruling on his motion.

*Failure to Try*

■ Roy alleges that his return to state custody, before being tried on his federal charges after arraignment before Judge Daly, violated Article IV(e) of the IAD. Specifically, he contends that when he was housed overnight at the Bridgeport CCC following his appearance in federal court on the afternoon of April 4, 1983, he became a "federal holdover prisoner," and, therefore, he should not have been returned to Somers CCI until he was first tried on the federal offenses.

At the hearing before this Court, United States Marshal Pasquale Mangini explained why Roy was placed overnight in the Bridgeport facility instead of returning him to Somers. The main consideration was that Roy was a "known escape risk," having escaped from the custody of federal marshals in Illinois. With Somers being about three hours away from Bridgeport, it was decided to house Roy at a facility a few minutes away from the federal courthouse rather than transport him a long distance during darkness. Second, the Marshal set forth the logistical problems encountered when prisoners are returned to Somers CCI "after hours," including difficulties in verifying and filing records. Third, the Marshal was aware that Roy might experience difficulty in being served an evening meal if he arrived at Somers late at night. Finally, the Marshal noted that to return Roy to Somers that night would involve over ten hours of overtime by a team of deputy marshals, which he wanted to avoid.

It seems clear that the failure to return Roy immediately to Somers CCI on April 4

was a violation of the IAD, albeit a minor and technical one. Article IV(e) provides in pertinent part that "[i]f trial is not had on any indictment ... prior to the prisoner's being returned to the original place of imprisonment ... such indictment ... shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." Thus, if the terms of the provision are literally enforced, the indictment must be dismissed. This is the view taken by the Third Circuit. *See, e.g., United States v. Williams*, 615 F.2d 585, 589–90 (3 Cir.1980) (violation of Article IV provides prisoner with "absolute" defense); *United States v. Thompson*, 562 F.2d 232, 235 (3 Cir.1977), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978) (mandatory sanctions of Article IV(e) not subject to court's discretion).

However, the Second Circuit has rejected a wooden application of the command of Article IV(e), and implied an exception to the sanction of dismissal in a situation where the removal of a prisoner from a state prison to federal custody is of short duration. In *United States v. Chico*, 558 F.2d 1047 (2 Cir.1977), *cert. denied*, 436 U.S. 947, 98 S.Ct. 2850, 56 L.Ed.2d 788

(1978), two state prisoners on several occasions were removed from a state prison and placed into federal custody for the purposes of arraignment, pleas and sentencing on federal charges. After each appearance in federal court, they were returned on the same day to the same state prison. Noting that the brief appearances before the federal court neither frustrated any purpose of the IAD nor involved imprisonment by the federal government, the Court of Appeals held Article IV(e) to be inapplicable.[7]

The case *sub judice* differs from *Chico* in that Roy was not immediately returned to the state prison from which he had been taken, but instead was returned the next day after spending the night in a state penal facility located near the federal court in Bridgeport.[8] In *United States v. Schrum*, 504 F.Supp. 23 (D.Kan.1980), *aff'd*, 638 F.2d 214 (10 Cir.1981), the court hypothetically posed the precise factual situation as in the instant case and concluded that, under the reasoning in *Chico*, the indictment in this case should be dismissed. *Id.* at 27.[9]

Were this Court to adopt the interpretation of *Chico* as set forth in *Schrum*, a

---

7. Specifically, the court stated:
   Article IV(e) of the Act does not apply to a case where a prisoner is removed from the prison of a state for a few hours to be arraigned, plead and be sentenced in the federal court without ever being held at any place of imprisonment other than that of the sending state and without interruption of his rehabilitation there.
   *Chico*, 558 F.2d at 1048.

8. Bridgeport CCC and Somers CCI are facilities within the general structure of the Connecticut state prison system. Although the federal authorities paid the state a fee for housing Roy overnight at the Bridgeport CCC, Marshal Mangini testified that this was done in error. He explained that typically the state does not charge the government when a state prisoner in Somers is temporarily relocated to another institution in Connecticut for the purpose of appearing in federal court. He stated that a credit refund would be issued by the state to the government for Roy's stay at the Bridgeport CCC on April 4.
   The government argues that Roy was not "held at [a] place of imprisonment other than

that of the sending state," *Chico*, 558 F.2d at 1049, and therefore the criteria set forth in *Chico* have been met. The Court disagrees. Roy's incarceration at the Bridgeport jail advanced no state interest and was not part of Roy's rehabilitation program as a state prisoner. For the purposes of the IAD, Roy must be considered to have been lodged in "*another* place of imprisonment in the receiving state," and not "returned to the *original* place of imprisonment" on April 4. *Id.* (emphasis in original).

9. The author of Comment, *The Interstate Agreement on Detainers: Defining the Federal Role,* 31 Vand.L.Rev. 1017 (1978), also anticipated the instant case. In an analysis of *Chico,* the author stated: "the approach [of the Second Circuit] is deficient in several respects, however, sacrificing predictability and certainty, generating litigation, and forcing individual evaluation of each case. What if the defendant remains overnight in federal custody before his return to state prison?" *Id.* at 1052. The author did not answer the question posed.

dismissal of Roy's indictment would follow. For several reasons, however, the Court prefers a more expansive reading of the principles enunciated in *Chico*. First, no goal of Congress in enacting the IAD was thwarted by the conduct of the federal authorities here. The primary purposes of the IAD are to require the prompt resolution of outstanding charges against the prisoner, to ensure that interruptions of a prisoner's rehabilitation programs in the sending state's institutions are minimized when he responds to the pending charges in the receiving state, and to eliminate the adverse psychological effects upon a sentenced prisoner created by the presence of long standing detainers in his prison file. *See, e.g., Lawson*, 736 F.2d at 839; *Stroble v. Anderson*, 587 F.2d 830, 835–36 (6 Cir. 1978), *cert. denied*, 440 U.S. 940, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Chico*, 558 F.2d at 1048–49.

No claim is made that Roy's overnight detention in Bridgeport obstructed in any way the possibilities of his rehabilitation at Somers. He was merely held for a few hours in a branch state facility on the return route to his original place of incarceration in the same state. For purposes of the IAD, "the situation [was] the same as if [he] had remained continuously in state prisons." *Chico*, 558 F.2d at 1049. All pending federal charges have been and are being processed against him in an expeditious and orderly manner. Moreover, there is no indication that Roy suffered any adverse psychological effects as a result of his brief stay in the Bridgeport jail on April 4. *See Sassoon v. Stynchombe*, 654 F.2d 371, 374 (5 Cir.1981) (release under Article IV(e) of the IAD in habeas corpus proceeding "is not justified where no 'legitimate interest' of the prisoner is defeated by the violation"); *People v. McLemore*, 95 Mich. App. 536, 291 N.W.2d 109, 120 (1980) ("[w]e will not reach out to find a violation of Article IV(e) where the motivating policies of that article have not been violated"), *rev'd on other grounds*, 411 Mich. 691, 311 N.W.2d 720 (1981); *People v. Cella*, 114

Cal.App.3d 905, 170 Cal.Rptr. 915, 924 (1981) (federal prisoner's return to federal custody after appearance in state court benefited prisoner, so that Article IV(e) was not violated); *but see Hughes v. Denver District Court*, 197 Colo. 396, 593 P.2d 702 (1979) (prisoner need not show prejudice from Article IV(e) violation in order for indictment to be dismissed); *People v. Meyers*, 109 Mich.App. 719, 311 N.W.2d 454, 456 (1981) (same).

Second, valid and compelling reasons existed for housing Roy in Bridgeport rather than transporting him at night to Somers. At the time, federal marshals believed that Roy was a dangerous criminal with a history of violence and escape from custody in his background. He had outstanding warrants against him for murder in California and Florida, and for bank robbery in Massachusetts. In October 1982, he reportedly had escaped from federal custody in Illinois, and, when arrested in Connecticut with a confederate, he allegedly possessed a shotgun and pistol. The decision to avoid a lengthy travel with Roy during darkness was logical, reasonable, and in conformity with the marshals' usual and customary practice under the circumstances. Moreover, the detention in Bridgeport served not only as a prudent safety measure for the protection of the marshals, but also as a sensible means to ensure Roy's personal comfort and meal requirements that evening. In effect, the interests of Roy as well as the government were advanced by the failure to return Roy to his original place of incarceration on April 4.

Finally, while the Court recognizes that it should apply the law as written by Congress, it is also true that the "surest was to misinterpret a statute or rule is to follow its literal language without reference to its purpose," *Viacom International, Inc. v. F.C.C.*, 672 F.2d 1034, 1040 (2 Cir.1982), or without regard to a result that would be unreasonable and absurd. *In re Adamo*, 619 F.2d 216, 222 (2 Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52

(1980) ("although the literal meaning of the words chosen by Congress is respected, we no longer follow a rigid, semantic approach to statutory construction").

The violation of the IAD in this case was a trifling and insignificant one. To release Roy by a mechanical application of the statute would constitute, in the Court's opinion, an inequity and "a result that Congress manifestly would not have wanted if the prospect of such application had been considered." *United States v. Perdue Farms, Inc.*, 680 F.2d 277, 286 (2 Cir.1982) (Newman, J., concurring). Under these circumstances, justice and good sense compel an interpretation of the provisions of the IAD which conforms to the intention and spirit of the legislation, even if it is not within the letter of the enactment.[10] *See United States v. Witkovich*, 353 U.S. 194, 199, 77 S.Ct. 779, 782, 1 L.Ed.2d 765 (1957) (the "tyranny of literalness" should be avoided); *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930) (departure from plain language of a statute justified if adherence results in an absurdity which shocks "the general moral or common sense").

Accordingly, for the foregoing reasons, the defendant's motion to dismiss is denied.

---

**10.** The Court's conclusion on this point is buttressed by Article IX of the IAD, which states in part, with emphasis added, that "[t]his agreement shall be liberally construed *so as to effectuate its purposes.*"